IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEI SOCIETA ESPLOSIVI<br>INDUSTRIALI SpA,<br><br>    Petitioner,<br><br>    v.<br><br>L-3 FUZING AND ORDNANCE<br>SYSTEMS, INC.,<br><br>    Respondent. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 11-149-RGA |

Kevin F. Brady, Esq., Wilmington, Delaware, Attorney for Petitioner.

Michael F. Bonkowski, Esq., Wilmington, Delaware, Attorney for Respondent

MEMORANDUM OPINION

Wilmington, Delaware
February 17, 2012

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court is the "Renewed Petition to Confirm International Arbitration Award" (D.I. 28) filed by Petitioner SEI Societa Esplosivi Industriali SpA and a Memorandum of Law opposing that petition filed by Respondent L-3 Fuzing and Ordnance Systems, Inc. (D.I. 35). For the reasons discussed, the renewed petition is granted.

## BACKGROUND

This lawsuit arises out of SEI's and L-3's collaboration, along with other defense contractors, in obtaining and satisfying a military procurement contract for fuzes for aircraft-delivered attack munitions. On July 5, 2000, the parties agreed to Purchase Order No. 453 ("Purchase Order"), by which L-3 was to produce certain electronic components of the fuzes and deliver them to SEI. The Purchase Order contained an arbitration clause extending to "[a]ny disputes or differences which may arise out of or in connection with" the Purchase Order. (D.I. 34-1 at 22).

L-3's electronics presented a safety issue, namely that the fuzes could arm earlier than a pilot intended in certain circumstances, such that L-3 did not deliver product that conformed to the contract specifications. (D.I. 32 at 3-4; D.I. 33 at 3). Without the electronics, SEI was unable to fulfill the procurement contract and agreements it had with the other defense contractors. (D.I. 33 at 6).

On May 12, 2006, SEI terminated the Purchase Order with a letter ("Termination Letter") that read, in part, as follows:

> [L-3] has expressly refused to deliver the equipment referred to in SEI's letter of April 13, 2006, free from defects and corresponding to the Purchase Order No. 00453. Moreover, [L-3] has not delivered such equipment within the deadline set by SEI. In doing so, [L-3] is breaching its obligations under the contract binding SEI and [L-3] and is in default.

2

> Therefore, SEI terminates the purchase order No. 00453 in accordance with the provisions of Article 23.1 ["Termination for Default"] . . . .

(D.I. 34-2; D.I. 34-1 at 15).

On October 1, 2007, the parties executed a letter agreement ("Letter Agreement") dated August 2, 2007, agreeing to arbitrate the dispute over the Purchase Order:

> All contract related disputes of SEI and [L-3] arising from the termination of Purchase Order No. 453 dated 5 July 2000, directed by SEI letter dated May 12, 2006, shall be submitted to arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce.
>
> The arbitration to be held in Geneva, Switzerland.
>
> Three arbitrators to decide the case with one arbitrator selected by each party and the two arbitrators selecting the third arbitrator.
>
> Swiss law shall govern the Arbitration.
>
> The Arbitration to be conducted in English Language.
>
> Mrs. Sabine Simkhovitch-Dreyfus shall not be an arbitrator in this matter.

(D.I. 34-3 at 3-4).

SEI brought a request for arbitration against L-3 on March 19, 2008, before the ICC, and L-3 counterclaimed. The parties agreed to Terms of Reference ("Terms of Reference") for the arbitration, agreeing to the scope of jurisdiction set forth in the 2007 Letter Agreement. (D.I. 34 at 7-8).

The arbitrator rendered a 109 page decision and entered a final award, dated October 25, 2010, to SEI totaling approximately $7 million, with interest accruing. (D.I. 30 - 33). The arbitrator summarized this as SEI prevailing on about 70% of its claims, and L-3, which had sought about $4,400,000 in lost profits and revenue (D.I. 31 at 5), failing on 100% of its claims.

3

(D.I. 33 at 20).

L-3 has not paid the award. On February 18, 2011, SEI filed a Petition to Confirm International Arbitration Award in this Court. (D.I. 1). SEI filed the Renewed Petition on July 25, 2011, seeking enforcement of the award plus interest. (D.I. 28). L-3 responded on August 1, 2011. (D.I. 35).

## PARTIES' CONTENTIONS

In opposing enforcement of the award, L-3 argues the arbitrator erred by finding a novation[1] of the contract between the parties with regard to who was to bear the costs of certification. L-3 claims the novation nullified a contractual limitation of L-3's overall liability. (D.I. 35 at 5). L-3 also argues the arbitrator erred by finding SEI terminated for L-3's nonperformance, rather than nondelivery, and awarding damages for nonperformance that the Purchase Order did not contemplate. (D.I. 35 at 6). Third, L-3 argues the arbitrator erred in not applying the *force majeure* provision to relieve L-3 of liability. (D.I. 35 at 7). Fourth, L-3 argues that SEI's alleged statements to French authorities, outside the arbitration, that L-3 was not at fault comprise prior admissions that should have nullified the award. (D.I. 35 at 17-18). L-3 concludes that these four errors constitute three defenses against confirmation of the award: a) manifest disregard for the governing Swiss law, b) violations of public policy, and c) actions beyond the scope of arbitration.

SEI argues that the arbitrator did not err. SEI argues the novation addressed only the costs of qualification, not damages under the contract as a whole; that SEI terminated for

---

[1] Under Swiss law, a novation "is a contract by which the parties extinguish a former obligation by replacing it by a new obligation that is distinct from the former obligation." (D.I. 32 at 29).

4

nonperformance; and that the *force majeure* provisions did not excuse L-3's nonperformance. (D.I. 28-1 at 8-11). SEI argues that manifest disregard for the law is not a defense to an international arbitration award; that even if the arbitrator did err, such error does not violate public policy; and that the award falls within the scope of arbitration as defined by the parties' agreements. (D.I. 28-1 at 6-7; 12-18).

## DISCUSSION

### A. Legal Standard

Section 201 of Title 9 of the United States Code states that "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 [hereinafter "the New York Convention," or "Convention"], shall be enforced in United States Courts in accordance with this chapter." Article I of the Convention states that it "shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between people, whether physical or legal."

United States courts must confirm foreign arbitral awards falling under the Convention except in very limited circumstances. Section 207 of Title 9 of the United States Code states:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

The "grounds for refusal or deferral of recognition or enforcement of the award" allowable under Article V of the New York Convention are:

(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that (a) the subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (b) the recognition or enforcement of the award would be contrary to the public policy of that country.

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958). The 1958 Convention shifted the burden of proof in an enforcement action to the party opposing enforcement and limited its defenses to the seven set forth in Article V. *See Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir.1974); *e.g., EDF Int'l S.A. v. YPF S.A.*, 2008 WL 5045915,

*3 (D. Del. Nov. 20, 2008). Article V of the Convention states that "[r]ecognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if the party furnishes to the competent authority where the recognition and enforcement is sought, proof that [one of the exceptions to recognition applies]."

The Convention applies to the present arbitral award because it was awarded in Switzerland and SEI seeks to enforce the award in the United States. Because SEI moved for confirmation within three years of receiving its arbitral award, this Court is required to confirm the arbitral award unless L-3 can prove one or more of the seven grounds for refusal.

### B. Decision

After reviewing the parties' arguments in light of the requirements of the New York Convention, the Court confirms the arbitral award. Manifest disregard for the law is not a defense to an arbitration award under the New York Convention. The award does not violate American public policy. The award is within the scope of the agreements to arbitrate.

#### 1. An arbitrator's "manifest disregard for the law" does not justify denying enforcement.

L-3 asserts that "manifest disregard of the law" can justify refusing to enforce an award and should here, while SEI argues this Court cannot refuse to enforce an award because of an error of fact or law by the arbitrator, and that only the seven defenses enumerated in 9 U.S.C. § 10 can justify not confirming an award. SEI is correct.

In 2006, the Third Circuit adopted the Second Circuit's holding that in light of the considerable case law confining District Court review to the seven Article V defenses, "mistake of fact and manifest disregard of the law do not justify setting aside an award." *Admart AG v.*

7

*Stephen and Mary Birch Foundation, Inc.*, 457 F.3d 302, 308 (3d Cir. 2006). In 2008, the Supreme Court held the seven Article V defenses are the "exclusive grounds" for vacating an award; mistake of law or fact cannot even be added as a defense by the parties' contract to arbitrate. *Hall Street Assoc's, LLC v. Mattel, Inc.*, 552 U.S. 576, 584, 595-96 (2008) ("We now hold that [9 U.S.C.] ∮∮ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification."). The review provisions "substantiat[e] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Id.* at 588. In 2010, after *Hall Street*, the Third Circuit reinforced its *Admart* holding that the Article V defenses "are the only grounds available for setting aside an arbitral award." *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account*, 618 F.3d 277, 291 (3d Cir. 2010).

L-3 argues in a footnote that there is still room for a "manifest disregard" defense in the Third Circuit, looking to cases from other Circuits applying such a defense after *Hall Street* and arguing *Ario* did not squarely address the defense's validity in this Circuit. (D.I. 35 at 8-9 n.7). To the contrary, *Admart*, *Hall Street*, and *Ario* are clear: there is no "manifest disregard for the law" defense for actions to enforce under the New York Convention in the Third Circuit. Because "manifest disregard for the law" is not a defense, this Court need not determine whether the arbitrator manifestly disregarded Swiss law.

### 2. The award does not violate American public policy.

Article V of the New York Convention provides a defense to an award where "[t]he recognition or enforcement of the award would be contrary to the public policy of [the country where recognition and enforcement is sought]." Enforcement of foreign arbitral awards may be

8

denied based on the New York Convention's public policy defense only where enforcement would violate the forum state's most basic notions of morality and justice. *Steel Corp. of Philippines v. Int'l Steel Serv's, Inc.*, 354 Fed.Appx. 689, 694 (3d Cir. 2009).

L-3 argues the arbitrator's errors violate contract principles and therefore American public policy. L-3 asserts the arbitrator violated public policy by finding a novation, not enforcing limitations of L-3's liability, not applying a *force majeure* provision, and finding L-3 to be at fault contrary to alleged admissions by SEI outside the arbitration. (D.I. 35 at 13-17). These assertions simply recast L-3's allegations of arbitrator error. Even if the arbitrator so erred, such errors do not rise to the level of offending America's most basic notions of morality and justice. *See Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004) ("Erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention."); *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 264 (2d Cir. 2003) (rejecting a contention that an arbitrator acted in manifest disregard of the law recycled as a public policy claim); *M&C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 851 n.2 (6th Cir. 1996) ("Nor can review for a 'manifest disregard of the law' be pigeonholed into the 'violation of public policy' basis for refusal to confirm an award contained in Article V(2)(b) of the New York Convention.").

It makes sense that L-3 cannot oppose enforcement of the arbitral award on the grounds that the arbitrator's contractual analysis was erroneous. One of the features of arbitration is that the parties agree that the arbitrator will resolve their dispute, subject to extremely limited judicial review. Arbitration is thought to be more expeditious and less expensive than litigation through

the courts. The arbitrator's factual and legal conclusions are not subject to the same sort of review that an appellate court would give to a trial court. The public policy exception is a very narrow one, and it is not a back door through which to take claimed errors of contract law that cannot be taken through the front door.

### 3. The award falls within the scope of the agreement to arbitrate.

Article V of the New York Convention provides a defense to an award where the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." Review of the scope of arbitration should favor arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000); *accord, Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

L-3 argues that the arbitrator's decision exceeded its jurisdiction, because (1) the only subject for which it had jurisdiction was whether SEI properly terminated the contract for a material breach by L-3 in regards to something other than "delivery," (D.I. 35 at 10); (2) the arbitrator found *sua sponte* that there had been a "novation," (*id.* at 10-12); and (3) the arbitrator found that SEI had terminated the contract for "non-performance." (*Id.* at 12-13). The arbitration award based its jurisdiction on the 2007 Letter Agreement to arbitrate, as follows in relevant part:

> All contract related disputes of SEI and [L-3] arising from the termination of Purchase Order No. 453 dated 5 July 2000, directed by SEI letter dated May 12, 2006, shall be submitted to arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce.
>
> ....

10

Swiss law shall govern the Arbitration.

(D.I. 30 at 26; D.I. 34-3). The parties accepted this jurisdiction in the arbitration's Terms of Reference. (D.I. 34 at 6-7).

Part of L-3's argument is that the arbitration's scope was limited by the May 2006 Termination Letter (D.I. 34-2), which used the word "deliver" in terminating the Purchase Order. L-3 argues that this means that SEI's termination was for nondelivery, not default or nonperformance, and argues the arbitration should have been confined to whether SEI's termination for nondelivery was proper under the Purchase Order and whether L-3 materially breached the contract for reasons other than delivery. (D.I. 35 at 10). L-3's argument fails because the grant of authority to the arbitrator was broad by its terms. The words "all" and "contract related" suggest that a broad, and not a narrow, interpretation is appropriate. The words "arising from" similarly suggest a broad construction. *See Battaglia*, 233 F.3d at 727. This jurisdiction mirrors the original Purchase Order's broad arbitration clause, which extended to "[a]ny disputes or differences which may arise out of or in connection with" the Purchase Order. (D.I. 34-1 at 22). The Letter Agreement's clause identifying the termination as being pursuant to SEI's May 2006 letter does not constrain the scope of "all contract related disputes." Nor was the 2006 termination solely for nondelivery; the 2006 Termination Letter states that L-3 "is breaching its obligations under the contract binding SEI and [L-3] and is in default" and that SEI was terminating under the Purchase Order's provision addressing "Termination for Default." (D.I. 34-2). Even if there were multiple plausible interpretations of the scope of arbitration, the ambiguity would be resolved in favor of affirming the arbitration award. *Battaglia*, 233 F.3d at 727.

The arbitration proceeded under this broader jurisdiction. The parties' requests exceeded the ultimate award. In the Terms of Reference, SEI requested nearly 2,000,000 euros, more than 5,400,000 dollars, and nearly half a million British pounds (not including 5% interest from May 12, 2006) (*see* D.I. 34 at 11-12, 15), or, using conversion rates from September 24, 2008, a total of roughly $9,245,000. L-3's claim for damages was about $8,800,000.[2] (D.I. 34 at 17). The "issues to be determined" included whether "the amounts requested by [SEI] are due." (*Id.*). L-3 knew that SEI alleged that L-3 had made repeated design mistakes, had repeated testing failures, and had issues with the safety conditions of the products. (*Id.* at 10-11). L-3 argued that it had been "improperly terminated for default . . . without cause." (*Id.* at 17). The arbitrator was to determine whether SEI owed L-3 for allegedly breaching the contract, and for the work L-3 performed for which SEI had not yet paid. (*Id.* at 16). Through 2009, the parties engaged in briefing and discovery, including expert testimony and evidentiary hearings, on these issues. (D.I. 30 at 16-23). The arbitrator found SEI terminated "on the grounds that [L-3] had not delivered a product that conformed [to] the contractually stipulated requirements" and found L-3 did not perform. (D.I. 31 at 5; D.I. 33 at 6).

L-3 fully participated in the arbitration's determination of default, and asserted counterclaims addressing the Purchase Order's full scope, not just nondelivery. (D.I. 34 at 16-17); *see United Indus. Workers v. Government of the Virgin Islands*, 987 F.2d 162, 168-69 (3d Cir. 1993) ("Because [a party] participated in the arbitration hearing without voicing objection to the arbitrator's authority to decide the matter, the [party] waived its right to challenge the arbitrator's

---

[2] L-3 reduced this claim for damages, presented in the Terms of Reference, to around $4,400,000 at the arbitration. *See* (D.I. 31 at 5).

jurisdiction."). L-3's arguments before the arbitrator were broad, and thus inconsistent with its claim now that the arbitrator's scope was limited.

L-3's other arguments comprise a criticism of the arbitrator's contractual analysis, with which it disagrees, recast as an argument that the arbitrator exceeded its authority. The arbitrator was submitted a complex contract dispute and relied upon (Swiss) contract principles to resolve the dispute; the losing party now complains that the errors, singly or in combination, show the arbitrator exceeded its authority. Looked at as a whole, that does not appear to be the case. The fact that the contract backdrop is Swiss law, the principles of which have not been briefed and which are otherwise unknown to the Court, makes L-3's argument more difficult to accept.

Closer analysis of L-3's arguments does not help L-3. L-3's first and third arguments, which seem complementary, are that termination for "non-performance" was not a proper ground. (D.I. 35 at 12). The arguments are not persuasive. SEI terminated for what it thought was a material breach. It identified the breach in a letter dated April 13, 2006, and thirty days later terminated the contract. In this regard, SEI followed the procedure established in § 23.1 of the Purchase Order, which permitted termination for a material breach. "[R]efus[ing] to deliver the equipment ... free from defects" and being "in default" seems to be nonperformance and therefore a material breach. *See* (D.I. 34-2). Whether there had been a material breach was the most significant "contract related" issue between SEI and L-3.

L-3's "novation" argument is not persuasive either. First, "novation" is a part of the "Swiss Code of Obligation." (D.I. 32 at 28-29). The Swiss Code of Obligation appears to be Swiss statutory contract law. An arbitrator who is entrusted with a contract dispute and resorts to contract principles to decide it would seem to be operating within the scope of its authority.

Even assuming the scope of arbitration was as L-3 argues - "whether SEI properly terminated the Contract for any material breach other than delivery or, conversely, whether [L-3] materially breached the Contract for reasons other than delivery, justifying termination by SEI" (D.I. 35 at 10) - the arbitrator would still have had to determine the contract's meaning (*i.e.*, whether the parties modified the contract through a novation or otherwise) and to determine whether L-3 performed and the consequences for any nonperformance. Both those determinations are within the narrower scope L-3 asserts. Second, L-3 states that the finding of a "novation" indicates the arbitrator exceeded its jurisdiction because neither party argued "novation" before the arbitrator. L-3 does not, however, point to any authority which supports the proposition that the arbitrator could only pick and choose between legal arguments specifically advanced by the parties.[3]

L-3 has not shown that the award was outside the scope of arbitration.

An appropriate order enforcing the award will be entered.

---

[3] The Third Circuit's opinion in *PMA Capital Ins. Co. v. Platinum Underwriters Bermuda Ltd.*, 400 Fed. Appx. 654, 2010 WL 4409655 (3d Cir. 2010), the only case cited by L-3, held that an arbitrator awarding relief that had not been requested exceeded the arbitrator's jurisdiction. That does not support the proposition that an arbitrator exceeds its jurisdiction if it awards the requested relief, or a portion thereof, on the basis of a legal principle not advanced by a party.